1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10
11
12
13

| | |
|---|---|
| AMARTE USA HOLDINGS, INC., | Case No. 22-cv-08958-CRB |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| KENDO HOLDINGS INC., et al., | |
| Defendants. | |

Plaintiff Amarte USA Holdings, Inc. ("Plaintiff") sells high-end skin care, including the EYECONIC eye cream, for which it holds a registered trademark.  Defendants[1] are the manufacturer and retailers of the MARC JACOBS BEAUTY EYE-CONIC ("MJB EYE-CONIC") eye shadow.  Alleging a likelihood of confusion between the two marks, Plaintiff sued Defendants for trademark infringement under federal and state law.  Plaintiff and Defendants now both move for summary judgment.

Because there is no likelihood of confusion between Defendants' MJB EYE-CONIC mark and Plaintiff's EYECONIC mark, the Court GRANTS Defendants' motion and DENIES Plaintiff's motion.

## I.    BACKGROUND

### A.    Plaintiff's EYECONIC Eye Cream

Plaintiff Amarte USA Holdings, Inc. sells high-quality skin care products throughout the United States.  See Kraffert Decl. (dkt. 95-53) ¶ 3.  In 2012, Plaintiff sold

---

[1] Kendo Holdings Inc. ("Kendo"), Marc Jacobs International, LLC ("Marc Jacobs"); Sephora USA, Inc. ("Sephora USA"), and The Neiman Marcus Group LLC ("Neiman Marcus") (collectively, "Defendants").

1   its first EYECONIC eye cream.  Id.  In 2013, Plaintiff became the owner of a registered

2   trademark for the standard character mark "EYECONIC" covering "eye cosmetics; eye

3   creams."  Id.

4       According to Plaintiff, it sent samples of its EYECONIC eye cream to Defendants

5   on multiple occasions.  Id. ¶ 9.  First, on January 31, 2013, Plaintiff sent Sephora USA one

6   free sample.  Id.  Then, on June 3, 2014, Plaintiff sent Neiman Marcus one free sample.

7   Id.  And on June 9, 2014, Plaintiff sent Sephora USA six free samples.  Id.

8       On June 24, 2014, Plaintiff met with Sephora Beauty Canada, Inc. ("Sephora

9   Canada") at Sephora USA's headquarters in San Francisco to discuss the sales of

10  Plaintiff's products—including the EYECONIC eye cream—in Sephora Canada's stores. [2]

11  See White Decl., Ex. 25 (dkt. 95-27) at 61:11–20; Harmon Decl., Ex. 87 (dkt. 91-2) at

12  83:1–16.  Lori Castagna and Marissa Caruso, two representatives from Sephora Canada,

13  were present.  See Third Harmon Decl., Ex. 116 (dkt. 118-4) at 180:20–181:7.  The parties

14  dispute whether a representative from Sephora USA was also at the meeting.  Defendants

15  say there was not, pointing to deposition testimony from Gabrielle Bridges, Plaintiff's

16  former Vice President of Sales, stating that she did not remember a Sephora USA buyer

17  being there.  See Def. Opp'n (dkt. 118) at 24; Second Harmon Decl., Ex. 112 (dkt. 102-3)

18  at 68:4–9.  Plaintiff disagrees, citing the fact that Ms. Bridges was shown an email that she

19  wrote stating that a Sephora USA buyer was present and that she testified she would not

20  have written the email unless it was true.  See Pl. Reply (dkt. 120) at 8; Second Harmon

21  Decl., Ex. 112 at 68:4–19.

22      Despite conducting routine searches for third-party infringing uses of the

23  EYECONIC mark on Google, Amazon, and eBay since 2016, Plaintiff did not become

24  aware of Defendants' MJB EYE-CONIC eye shadow until September 2021.  See Kraffert

25  Decl. ¶ 6–8.  On October 5, 2021, Plaintiff sent a cease-and-desist letter to Marc Jacobs.

26  See White Decl., Ex. 1 (dkt. 95-3).  Marc Jacobs' general counsel forwarded this email to

27

28  _____

[2] Plaintiff has not named Sephora Canada as a defendant.

United States District Court
Northern District of California

1    Kendo's general counsel, who responded to Plaintiff on November 21 stating that Kendo

2    had discontinued its MJB EYE-CONIC eye shadow and would be finished selling its

3    remaining inventory "within the next sixty (60) days."[3]  See Loftis Decl., Ex. 24 (dkt. 91-

4    1) at 2–3.  Kendo did not sell any MJB EYE-CONIC to retailers after December 31, 2021.

5    See Loftis Decl. ¶ 58.  However, Sephora USA continued sales of the product until

6    February 5, 2022.  See Abrams Decl. (dkt. 91-5) ¶ 14.  Plaintiff continues to sell its

7    EYECONIC eye cream to this day.  See, e.g., Harmon Decl., Ex. 52 (dkt. 91-2) (sales from

8    January through December 2023).

9       **B.    Defendants' MJB EYE-CONIC Eye Shadow**

10          In May 2012, Kendo and Marc Jacobs agreed to develop a line of beauty products

11   to be sold under the MARC JACOBS trademark.  See Loftis Decl., Ex. 1 ¶ 6.  Kendo sold

12   the cosmetics in this line through luxury retailers, including Sephora USA, Neiman

13   Marcus, and Marc Jacobs.  See Loftis Decl. ¶¶ 42–43; Loftis Decl., Ex. 17.  Kendo

14   launched the MJB product line in 2013, which included an eye shadow called "MARC

15   JACOBS BEAUTY STYLE EYE-CON."  See Loftis Decl. ¶ 13.  The external product

16   packaging for the eye shadow depicted the phrase "EYE-CONIC COLORS."  See Loftis

17   Decl., Ex. 3.  Kendo sold the eye shadow from 2013 through 2017.  Loftis Decl. ¶ 15.

18          In 2017, Kendo relaunched the eye shadow under the name "EYE-CONIC."  Id. ¶¶

19   16–18, 23.  Kendo chose the name EYE-CONIC as a homage to the iconic status of the

20   fashion designer Marc Jacobs and because it had previously used the phrase on the

21   packaging for the MARC JACOBS BEAUTY STYLE EYE-CON eye shadow.  Id. ¶ 17.

22   Kendo's copy team undertook significant market research prior to selecting the name for

23   Marc Jacob's new eye shadow.  Id. ¶ 20.  The team did not find Plaintiff, its EYECONIC

24   eye cream, or its registered trademark.  Id. ¶¶ 20, 64.

25          Kendo used significant resources to generate consumer awareness around the MJB

26

27   _____

28   [3] Marc Jacobs had already stopped selling the MJB EYE-CONIC eye shadow.  See Perrin
     Decl. (dkt. 91-6) ¶ 19 (ceased sales in June 2021).  Same with Neiman Marcus.  See Hall
     Decl. (dkt. 91-4) ¶ 20 (no sales after December 2020).

United States District Court
Northern District of California

EYE-CONIC eye shadow.  Id. ¶ 24.  The product's launch included billboards, supermodel spokespersons, and heavy social media promotion through celebrities with millions of followers on social media platforms.  See id. ¶¶ 25–41.

Kendo sold ████ units of MJB EYE-CONIC, including ████ in 2017 alone.  Id. ¶¶ 46, 51.  However, the product was costly to manufacture because it used high quality materials and Kendo ████████████ to Marc Jacobs for the use of the "MARC JACOBS" trademark.  Id. ¶ 55.  As a result, the product line, including MJB EYE-CONIC, was not profitable.  Id.  Kendo and Marc Jacobs terminated the licensing agreement and discontinued the product line on September 30, 2021.  Id. ¶¶ 56, 57.

As part of the termination of the licensing agreement, Kendo and Marc Jacobs ████████████████████████████████████████████████ ████████████████████████████ Id. ¶ 58.  Kendo did not sell any MJB EYE-CONIC to retailers after December 31, 2021.  Id. ████████████████ ████████████████████████████████████████████████ Id. ¶ 59. ████████████████████████████████ ████████████████████████████ Id. ¶ 60.  Kendo says it has no intention to revive the Marc Jacobs Beauty line or to use the name "EYE-CONIC" on any future product.  Id. ¶¶ 62–63.

## C.  Procedural History

On December 19, 2022, Plaintiff sued Defendants for federal trademark infringement under 15 U.S.C. § 1114, federal unfair competition under 15 U.S.C. § 1125(a), common law trademark infringement, common law passing off and unfair competition, and unfair competition under the California Business & Professions Code § 17200.  See Compl. (dkt. 1).  Plaintiff named the following defendants: Kendo, Marc Jacobs, Sephora USA, Walmart Inc., Neiman Marcus, and Nordstrom Inc.  See id.  Thereafter, Plaintiff voluntarily dismissed Nordstrom and settled with Walmart.  See Notice (dkt. 33); Order of Dismissal (dkt. 65).  On December 4, 2023, this Court permitted Kendo to add a counterclaim for cancellation of Plaintiff's EYECONIC trademark

United States District Court
Northern District of California

1    registration.  See Order Gr. Leave to Amend (dkt. 96).

2         Plaintiff and Defendants both move for summary judgment.  See Pl. MSJ (dkt. 106);

3    Def. MSJ (dkt. 91).  In addition, Defendants move to strike both Plaintiff's and

4    Defendants' jury demand.  See Mot. to Strike (dkt. 113).  And Plaintiff moves to exclude

5    Defendants' experts Brian M. Daniel, see Mot. to Exclude Daniel (dkt. 134), and John R.

6    Hauser, see Mot. to Exclude Hauser (dkt. 135).  The Court held a hearing on the summary

7    judgment motions earlier this year.  See Minute Entry (dkt. 153).

8    **II.    LEGAL STANDARD**

9         Summary judgment is proper when there is "no genuine dispute as to any material

10   fact and the [moving party] is entitled to judgment as a matter of law."  Fed. R. Civ. P.

11   56(a).  Material facts are those that may affect the outcome of the case.  Anderson v.

12   Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine

13   if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

14   party."  Id.

15        The moving party bears the initial burden of identifying those portions of the

16   pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of

17   material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  Where the moving

18   party will have the burden of proof on an issue at trial, it must affirmatively demonstrate

19   that no reasonable trier of fact could find other than for the moving party.  Id.  But on an

20   issue for which the opposing party will have the burden of proof at trial, the moving party

21   need only point out "that there is an absence of evidence to support the nonmoving party's

22   case."  Id.

23        Once the moving party meets its initial burden, the nonmoving party must go

24   beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by

25   "citing to particular parts of material in the record" or "showing that the materials cited do

26   not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c).  A

27   triable dispute of fact exists only if there is sufficient evidence favoring the nonmoving

28   party to allow a jury to return a verdict for that party.  Anderson, 477 U.S. at 249.  If the

United States District Court
Northern District of California

1    nonmoving party fails to make this showing, "the moving party is entitled to judgment as a

2    matter of law." Celotex, 477 U.S. at 323.

3        It is not a court's task "to scour the record in search of a genuine issue of triable

4    fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996) (internal citation omitted).

5    Rather, a court is entitled to rely on the nonmoving party to "identify with reasonable

6    particularity the evidence that precludes summary judgment." See id. When deciding a

7    summary judgment motion, courts must view the evidence in the light most favorable to

8    the nonmoving party and draw all justifiable inferences in its favor. Anderson, 477 U.S. at

9    255; see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

10       Finally, when parties file cross-motions for summary judgment, the court must

11   consider all the evidence submitted in support of the motions to evaluate whether a

12   genuine dispute of material fact exists precluding summary judgment for either party. The

13   Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1135 (9th

14   Cir. 2001).

15   **III.   DISCUSSION**

16       First, the Court addresses whether either party is entitled to summary judgment on

17   the merits. Because no reasonable trier of fact could find a likelihood of confusion

18   between Defendants' MJB EYE-CONIC mark and Plaintiff's EYECONIC mark, and

19   because Plaintiff must establish a likelihood of confusion to prevail on any of its claims,

20   the Court GRANTS summary judgment for Defendants and DENIES summary judgment

21   for Plaintiff. Second, the Court determines the effect of its summary judgment ruling on

22   the parties' remaining motions.

23       **A.    Merits of Plaintiff's Claims**

24       Defendants have demonstrated that there is no genuine dispute of material fact for

25   any of Plaintiff's five claims—federal trademark infringement, federal unfair competition,

26   common law trademark infringement, common law passing off and unfair competition,

27   and unfair competition under the California Business and Professions Code § 17200—such

28   that they are entitled to judgment as a matter of law. The Court addresses Plaintiff's

United States District Court
Northern District of California

1    claims in turn.

2                    **1.    Federal Trademark Infringement**

3            To prevail on a claim for federal trademark infringement, a plaintiff must

4    demonstrate (a) ownership of a valid trademark, and (b) use by defendant in commerce of

5    a mark (c) likely to cause confusion.  See Network Automation, Inc. v. Advanced Sys.

6    Concepts, Inc., 638 F.3d 1137, 1144 (9th Cir. 2011).

7                    **a.    Ownership of the Mark**

8            On April 30, 2013, Plaintiff became the owner of the U.S. Trademark Registration

9    Number 4328655 for the standard character mark "EYECONIC" under "[c]lass 3: eye

10   cosmetics; eye creams."  See Kraffert Decl. ¶ 3; Registration (dkt. 1-1).  Plaintiff's

11   registration and ownership of the mark constitutes prima facie evidence of the mark's

12   validity and Plaintiff's exclusive right to use the mark on the goods specified in the

13   registration.  See 15 U.S.C. § 1115(b); Applied Info. Scis. Corp. v. eBay, Inc., 511 F.3d

14   966, 970 (9th Cir. 2007).

15           Defendants argue that Plaintiff cannot show that it holds a valid, protectable

16   trademark because Plaintiff has never used its mark in connection with "eye cosmetics"

17   and therefore its registration should be cancelled.  See Def. Opp'n at 6–7; see 15 U.S.C.

18   § 1064(6) (registration may be cancelled if "the registered mark has never been used in

19   commerce on or in connection with some or all of the goods or services recited in the

20   registration").  Defendants have asserted a counterclaim for cancellation of Plaintiff's

21   trademark registration on this basis, see Am. Answer (dkt. 99) at 14–16, and argue that

22   because the counterclaim is pending, there is a genuine issue of material fact regarding

23   whether Plaintiff owns a valid mark.  See Def. Opp'n at 7.

24           But at the hearing, Defendants admitted that, if and until the Court rules in their

25   favor on the counterclaim, Plaintiff has ownership of a valid trademark.  Because

26   Defendants do not move for summary judgment on the counterclaim, the Court declines to

27   adjudicate it at this time.  Therefore, the Court concludes that Plaintiff has ownership of a

28   valid trademark—"EYECONIC," for use with "eye cosmetics; eye creams"—and has

United States District Court
Northern District of California

1    since 2013.

2                          **b.    Defendants' Use in Commerce**

3           Defendants do not dispute that they used the MJB EYE-CONIC mark in commerce.

4    See generally Def. MSJ; Def Opp'n.  Nor could they reasonably dispute it.  See, e.g.,

5    Loftis Decl. ¶¶ 46–51 (describing Kendo's sales of MJB EYE-CONIC); Abrams Decl. ¶ 8

6    (describing Sephora USA's sales of MJB EYE-CONIC); Perrin Decl. ¶ 19 (describing

7    Marc Jacobs' sales of MJB EYE-CONIC); Hall Decl. ¶¶ 16–18 (describing Neiman

8    Marcus's sales of MJB EYE-CONIC).

9                          **c.    Likelihood of Confusion**

10          A likelihood of confusion occurs when consumers "are likely to assume that a

11   product or service is associated with a source other than its actual source because of

12   similarities between the two sources' marks or marketing techniques."  Int'l Jensen, Inc. v.

13   Metrosound U.S.A., Inc., 4 F.3d 819, 825 (9th Cir. 1993) (citation omitted).  The Ninth

14   Circuit has recognized two distinct theories of confusion: "forward confusion" and

15   "reverse confusion."  Surfvivor Media, Inc. v. Survivor Prods., 406 F.3d 625, 630 (9th Cir.

16   2005).  Forward confusion is when "consumers believe that goods bearing the junior mark

17   came from, or were sponsored by, the senior mark holder."  Id.  By contrast, reverse

18   confusion is when "consumers dealing with the senior mark holder believe that they are

19   doing business with the junior one."  Id.  Here, Plaintiff alleges only a theory of forward

20   confusion.[4]  See Compl. (dkt. 1) ¶¶ 49, 59.  Therefore, to avoid summary judgment for

21   Defendants, Plaintiff must raise a material question of fact regarding whether a

22   "reasonably prudent consumer in the marketplace" is likely to think that Defendants' MJB

23   EYE-CONIC eye shadow was made by, or affiliated with, Plaintiff and its EYECONIC

24   eye cream.  See Surfvivor Media, Inc., 406 F.3d at 630.

25

26   _____

27   [4] Plaintiff asserts that it is "reserving its right to establish reverse confusion at trial."  Pl.
     MSJ at 3 n.1.  However, as Defendants correctly pointed out at the hearing, Plaintiff does
     not allege reverse confusion anywhere in its complaint.  See generally Compl.  Therefore,
28   the Court need not determine whether there is an issue of material fact on a reverse
     confusion theory.  See Surfvivor Media, Inc., 406 F.3d at 631.

United States District Court
Northern District of California

The Ninth Circuit has developed eight factors—the <u>Sleekcraft</u> factors—to guide the likelihood of confusion determination. <u>GoTo.com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199, 1205 (9th Cir. 2000) (citing <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341, 348–49 (9th Cir. 1979)).  As applied here, those factors are: (i) strength of Plaintiff's mark; (ii) relatedness of the goods; (iii) similarity of the marks; (iv) evidence of actual confusion; (v) the marketing channels used; (vi) the degree of care likely to be exercised by purchasers; (vii) Defendants' intent in selecting its mark; and (viii) likelihood of expansion into other markets.  <u>See id.</u>  The Court addresses each factor in turn.

### i.     Strength of Plaintiff's Mark

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." <u>Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.</u>, 174 F.3d 1036, 1058 (9th Cir. 1999).  A mark's strength is "evaluated in terms of its conceptual strength and commercial strength." <u>GoTo.com, Inc.</u>, 202 F.3d at 1207.

"Marks can be conceptually classified along a spectrum of increasing inherent distinctiveness." <u>Id.</u>  "From weakest to strongest, marks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." <u>Id.</u>  "[S]uggestive, arbitrary, and fanciful marks are 'deemed inherently distinctive and are automatically entitled to protection because they naturally serve to identify a particular source of a product.'" <u>Quiksilver, Inc. v. Kymsta Corp.</u>, 466 F.3d 749, 760 (9th Cir. 2006).  Although inherently distinctive, "suggestive marks are presumptively weak." <u>Brookfield</u>, 174 F.3d at 1058.

Plaintiff contends that its EYECONIC mark is "distinctive," appearing to argue that it should be classified as suggestive. <u>See</u> Pl. MSJ at 10 (citing <u>Zobmondo Ent., LLC v. Falls Media, LLC</u>, 602 F.3d 1108, 1113 (9th Cir. 2010)); Pl. Opp'n (dkt. 95) at 19.  Defendant, too, asserts that the mark should be classified as "suggestive." <u>See</u> Def. Reply (dkt. 102) at 11.  Suggestive marks do not "describe the product's features but suggest[] them." <u>See</u> <u>Surfvivor Media, Inc.</u>, 406 F.3d at 632 (citation omitted).  An "exercise of some imagination" is needed to associate a suggestive mark with the product. <u>See id.</u>

The Court agrees that Plaintiff's mark is suggestive: the exercise of "some imagination" is needed to associate "EYECONIC" with an eye cream. That means Plaintiff's mark is inherently distinctive[5] and entitled to some protection but is presumptively weak. Cf. Harman Int'l Indus., Inc. v. Jem Accessories, Inc., 668 F. Supp. 3d 1025, 1040 (C.D. Cal. 2023).

Commercial strength is based on "actual marketplace recognition," and thus "advertising expenditures can transform a suggestive mark into a strong mark." Network Automation, Inc., 638 F.3d at 1149 (quoting Brookfield, 174 F.3d at 1058). Other factors suggesting commercial success—like length of exclusive use and public recognition—can similarly strengthen a suggestive mark. See M2 Software, Inc. v. Madacy Ent., 421 F.3d 1073, 1081 (9th Cir. 2005).

Plaintiff argues that its sales figures, ████████ worth of product, which Plaintiff says accounts for ████ total units sold, and that it has been selling EYECONIC eye creams for more than eleven years illustrate its commercial success. See Pl. MSJ at 11; Harmon Decl., Exs. 41–52 (dkt. 91-2). Defendants dispute that those facts show commercial strength, citing Brady v. Grendene USA, Inc., 2014 WL 5783771, at *7 (S.D. Cal. Nov. 6, 2014). See Def. MSJ at 15–16. There, the court found that sales of "only a few thousand swimsuits" in the "half decade" prior to the lawsuit evidenced poor commercial strength. Brady, 2014 WL 5783771, at *7. Plaintiff attempts to distinguish Brady because it involved "swimsuits" rather than an "expensive product" like the EYECONIC eye cream." Pl. Reply at 10. This argument is not persuasive. First, Plaintiff is wrong on the facts. The swimwear in Brady retailed for $100 to $150, see 2014 WL 5783771, at *8, which is more than the $80 to $90 sale price for the EYECONIC eye cream, see Khalil Decl., Ex. 3 (dkt. 106-5); White Decl., Ex. 16 ("Wind Report") (dkt. 95-

---

[5] The Patent and Trademark Office issued Plaintiff's trademark registration without requiring proof of secondary meaning, see Khalil Decl. (dkt. 106-2) ¶ 2, so Plaintiff is entitled to a presumption that the EYECONIC mark is inherently distinctive. See Quiksilver, Inc., 466 F.3d at 760. But because the mark is suggestive, it is inherently distinctive regardless of its registration history.

United States District Court
Northern District of California

1   18).  Second, even taking the price of Plaintiff's eye cream into account, only ████

2   and ███ units of sales in over a decade is poor commercial strength.  Akin to the sales in

3   <u>Brady</u>, Plaintiff sold only ████████████ units in the five years before this lawsuit.

4   <u>See</u> Harmon Decl., Exs. 47–50.  And making its case for commercial success even weaker

5   than in <u>Brady</u>, Plaintiff points to no advertising expenditures that could strengthen the

6   mark.  <u>See</u> Pl. MSJ at 11.

7         Plaintiff does cite its "significant unsolicited media coverage in well-known media

8   outlets, including The Oprah Magazine, Vogue, the Wall Street Journal, Vanity Fair,

9   People, and Fortune" to support its commercial strength.  <u>See</u> Pl. MSJ at 11; <u>see</u> White

10   Decl., Ex. 43 (dkts. 95-46, 47).  But that this is the extent of the media coverage for the

11   EYECONIC eye cream further confirms its poor commercial success.  Several of the cited

12   articles are about <u>other</u> products that Plaintiff sells, and the remaining ones feature the

13   EYECONIC eye cream along with many other products, such that any effect on actual

14   marketplace recognition is limited.  Finally, Plaintiff points to its enforcement efforts, <u>see</u>

15   Pl. Opp'n at 3, but fails to explain the extent of these efforts or how they have established

16   "actual marketplace recognition."  <u>See</u> Brookfield, 174 F.3d at 1058.

17         In sum, both the conceptual and commercial strength of Plaintiff's mark are weak

18   and in turn, so is the overall strength.  This factor favors Defendants.

19                       **ii.**       **Relatedness of the Goods**

20         "Related goods are generally more likely than unrelated goods to confuse the public

21   as to the producers of the goods."  <u>Brookfield</u>, 174 F.3d at 1055.  Goods are related when

22   they are "complementary, sold to the same class of purchasers, or similar in use and

23   function."  <u>Ironhawk Techs., Inc. v. Dropbox, Inc.</u>, 2 F.4th 1150, 1163 (9th Cir. 2021).

24         Plaintiff argues that the EYECONIC eye cream and the MJB EYE-CONIC eye

25   shadow are related because they are complementary, sold to the same high-end customers,

26   and serve the same function to improve the area around the eyes.[6]  <u>See</u> Pl. MSJ at 6.

27   _____

28   [6] Plaintiff goes so far as to assert that the products are "identical" since "both are eye
cosmetics."  <u>See</u> Pl. MSJ at 6.  But obviously an anti-aging eye cream and an eye shadow

United States District Court
Northern District of California

1   Plaintiff also claims the Ninth Circuit has found more disparate products and services to be

2   related.  See Pl. MSJ at 7 (citing cases).

3          Defendants disagree on all bases.  They argue that an anti-aging eye cream is

4   neither complementary, nor similar in function, to an eye shadow palette.  Def. Opp'n at

5   14.  Whereas Plaintiff's anti-aging cream purports to hydrate and "nourish[]" skin while

6   "promot[ing] elasticity without irritation," see Harmon Decl., Ex. 38 (dkt. 91-2),

7   Defendants' eye shadow offered dramatic and colorful shades of eye makeup.  Id.

8   Defendants also contend that the clientele for the products is different: Defendants'

9   customers sought bold-colored makeup, and Plaintiff's clients are concerned with aging.

10  See id.

11         The Court agrees with Defendants.  These two products have different uses—

12  getting rid of wrinkles versus enhancing facial features with bright colors.  They target

13  different consumers: Plaintiff's eye cream targets consumers interested in reducing the

14  effects of aging whereas Defendants' eye shadow targeted individuals of all ages desiring

15  dramatic eye makeup.  And Plaintiff has put forth no evidence for why the two products

16  are complementary—that is, why consumers would necessarily use the two products

17  together.  Just because the products "fall within the same general field"—products to use

18  around your eyes—"does not mean that the two products or services are sufficiently

19  similar to create a likelihood of confusion."  Worx4u2, Inc. v. Earthwhile Endeavors, Inc.,

20  2022 WL 1601399, at *9 (C.D. Cal. Apr. 5, 2022) (citation omitted); see Mach v. Head v.

21  Dewey Global Holdings, Inc., 61 U.S.P.Q.2d 1313, 1318 (N.D. Cal. 2001) ("The fact that

22  both products could broadly be described as relating to music is not sufficient to find that

23  the products have a similar use or function.").  The cases that Plaintiff cites do not counsel

24  otherwise.[7]  See Pl. MSJ at 6.

25
_____
26  palette are not "identical."

27  [7] None of the cases Plaintiff cites are controlling authority, and they are all distinguishable
    on the facts of this case.  See Glow Indus., Inc. v. Lopez, 252 F. Supp. 2d 962, 993 (C.D.
28  Cal. 2002) (finding the parties' "product lines" to be related because "both companies offer
    lotion, shower gel, and fragrance product"); Boldface Licensing + Branding v. By Lee

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

1      The Court concludes that Plaintiff's EYECONIC eye cream and Defendants' MJB

2    EYE-CONIC eye shadow are not related.  This factor, too, favors Defendants.

3                    iii.      **Similarity of the Marks**

4      The third factor considers the similarity of the marks.  Similarity of the marks "has

5    always been considered a critical question in the likelihood-of-confusion analysis."  See

6    GoTo.com, 202 F.3d at 12-5 (citing Brookfield, 174 F.3d at 1054).  No matter how similar

7    the goods and marketing channels, if the marks are not very similar, there is little risk of

8    confusion.  See Playmakers, 297 F. Supp. 2d at 1282 ("The most important factor in any

9    likelihood of confusion analysis is the similarity of the marks.  Without similarity, there

10   can be no confusion.").  Courts "should not myopically focus on only the alleged

11   counterfeit marks to the exclusion of the entire product or even common sense."  Arcona,

12   Inc. v. Farmacy Beauty, LLC., 976 F.3d 1074, 1080 (9th Cir. 2020).  Marks should be

13   "considered in their entirety and as they appear in the marketplace."  Brookfield, 174 F.3d

14   at 1055 (internal quotation marks omitted).

15     The parties' marks, as they appear in the marketplace, are pictured below.



---

25   Tillett, Inc., 940 F.Supp.2d 1178 (C.D. Cal. 2013) (finding relatedness where some of the
     parties' products were identical); Elizabeth Kent Cosmetics, Inc. v. G. B. Kent & Sons,
26   Ltd., 309 F.2d 775, 776 (C.C.P.A. 1962) (no analysis of relatedness); Stendhal v. R. H.
     Cosmetics Corp., 211 U.S.P.Q. 1016 (TTAB 1981) (same); In re Prestige Cosmetics, No.
27   76691045, 2009 WL 1741902 (TTAB 2009) (analyzing possible relatedness based on
     trademark registrations, without the context of actual products sold); In re Jamie OBanion,
28   No. 77843205, 2011 WL 1886399 (TTAB 2011) (same).

1    See Wind Report at 11–12.

2          Considering the marks in their entirety, and despite both having the name

3    EYECONIC, the Court concludes that they are not similar.  First, and most importantly,

4    both products have a prominent housemark.  Plaintiff's eye cream has an "amarte"

5    housemark in big, bold letters, while Defendants' product has "MARC JACOBS" in big,

6    capital letters on both the packaging and the eye shadow palette.  Second, the shape and

7    packaging of the products are different: Plaintiff's eye cream comes in a narrow white and

8    gold tube, whereas Defendants' eye shadow is sold in a rectangular box with a flat white

9    palette inside.  Third, unlike Plaintiff's mark, Defendants' mark separates "EYE" and

10   "CONIC" with a hyphen.  Fourth, Plaintiff's corporate representative actually admitted

11   that the packaging for Defendants' MJB EYE-CONIC eye shadow "looks nothing like" the

12   packaging for Plaintiff's EYECONIC eye cream.  See Harmon Decl., Ex. 27 at 166:3–15.

13   The Court does find that the packaging for the products is a similar color, but Defendants

14   explained at the hearing that it also sold the MJB EYE-CONIC eye shadow with different

15   colored packaging.  See, e.g., Harmon Decl., Ex. 4 (photos of the eye shadow packaging in

16   other colors).  Because multiple colors appear in the marketplace, that one of the colors is

17   similar does not change the Court's conclusion that the marks, as considered in their

18   entirety, are not similar.

19         The Ninth Circuit recently compared the marks for two skincare products—both

20   called EYE DEW—and concluded that the marks were not similar and therefore there was

21   no likelihood of confusion.  See Arcona, 976 F.3d at 1076–80.  Similar to Plaintiff's

22   EYECONIC product, Arcona's EYE DEW product is an eye cream packaged in a "tall,

23   cylindrical, silver bottle."  Id. at 1076. The product featured the phrase "EYE DEW" and

24   the Arcona housemark on the bottle and the packaging.  Id.  The defendant, Farmacy

25   Beauty, also sold an eye cream called "EYE DEW."  Id.  It came in a "short, wide, white

26   jar, along with a squarish outer box."  Id.  The product featured the phrase "EYE DEW"

27   and its housemark on both the jar and the packaging.  Id.

28         Despite both products being eye creams and having the same "EYE DEW" name,

the Ninth Circuit held that "no reasonable consumer would be confused by these two products because the packaging, size, color, shape, and all other attributes—other than the term "EYE DEW"—are not remotely similar." Id. at 1080–1081.  The court also noted that it would be "implausible that a consumer would be deceived because the products had their respective housemarks . . . prominently on the packaging." Id.

That the Ninth Circuit found the marks in Arcona not to be similar supports the Court's same conclusion about the marks in this case.  Like in Arcona, both Plaintiff and Defendants have their housemark prominently on their product's packaging, which negates consumer confusion.  The only real similarity between Plaintiff's eye cream and Defendants' eye shadow is the mark itself, which is even less similar than the marks in Arcona.  Whereas the EYE DEW marks in Arcona were identical, the marks here differ slightly given that Defendants' is separated with a hyphen.  See Ex. 92.

Plaintiff attempts to reduce the force of Arcona by pointing to a "preeminent commentator['s]" remark that Arcona is an extreme holding.  See Pl. MSJ at 6. (citing 4 McCarthy on Trademarks and Unfair Competition § 23:52 (5th ed.)).  Arcona may be an "extreme holding," but it is recent, binding Ninth Circuit precedent that this Court must consider.  Plaintiff also cites to Pom Wonderful LLC v. Hubbard, 775 F.3d 1118 (9th Cir. 2014), but that case does not support its argument that these marks are similar, either.  Pom Wonderful involved two pomegranate beverages with marks that the court found similar based, in part, on their "many visual similarities." Id. at 1130.  Plaintiff does not show that visual similarities exist between the marks at issue here.

The Court concludes that the parties' products have dissimilar marks because the packaging, size, and shape are entirely different (which Plaintiff's corporate representative admitted), and because the house marks on both products are prominent.  976 F.3d at 1080–81.  This factor weighs strongly in the Defendants' favor.  See Brookfield, 174 F.3d at 1054 ("Where [] two marks are entirely dissimilar, there is no likelihood of confusion.");  Arcona, 976 F.3d at 1081 (affirming the district court's grant of summary judgment that there was no likelihood of consumer confusion because the marks were dissimilar).

1

### iv.    Evidence of Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." Sleekcraft, 599 F.2d at 352.  On the flip side, the Ninth Circuit has stated that it "cannot think of more persuasive evidence that there is no likelihood of confusion" between two marks than that "they have been simultaneously used for [several] years without causing any consumers to be confused as to who makes what." See Brookfield, 174 F.3d at 1050.

Plaintiff provides no evidence that customers were confused about the source of Defendants' eye shadow when it was being sold from 2017 to 2022.  In fact, when Plaintiff's corporate representative was asked if he was "aware of any consumers who were actually confused between Marc Jacobs Beauty Eye-Conic eye shadow product and the Plaintiff Eyeconic product," he responded "no."  See Harmon Decl., Ex. 27 at 58:16–20.  Plaintiff does, however, submit evidence of confusion from 2023, after Defendants stopped selling the MJB EYE-CONIC eye shadow, in the form of an expert survey.  See Pl. MSJ at 12.  Plaintiff's expert found between 24% and 38% "net confusion."  See Wind Report at 6.

The question, then, is whether Plaintiff's survey evidence of actual confusion after Defendants stopped selling their product is sufficient evidence of actual confusion to preclude summary judgment for Defendants.  See Thane Int'l, Inc. v. Trek Bicycle Corp., 305 F.3d 894, 903 (9th Cir. 2002); Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263–64 (9th Cir. 2001) (noting that the presence of survey evidence will not always preclude summary judgment).

Defendants argue that this survey evidence is unreliable because the question of likelihood of confusion "turns on marketplace realities that can change dramatically from year to year.  See Def. Opp'n. at 18 (quoting Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc., 140 S. Ct. 1589, 1596 (2020)).  But Defendants point to no changes in "extrinsic factors" or "marketplace realities" between February 2022 (when the last MJB EYE-CONIC product was sold) and 2023 (when Plaintiff's expert completed the survey).

United States District Court
Northern District of California

1   Given the close proximity in time, it is likely that the survey evidence accurately sheds

2   light on marketplace realities in at least early 2022, when the eye shadow was still being

3   sold.

4          Even considering the survey evidence, however, this factor is still mixed.  While the

5   range of "net confusion" found by Plaintiff's expert is not insubstantial, neither does it

6   confirm actual confusion.  Plaintiff's corporate representative admitted that it is not aware

7   of any customers who were confused between the EYECONIC eye cream and the MJB

8   EYE-CONIC eye shadow during the five years that the products were both sold.  See

9   Harmon Decl., Ex. 27 at 58:16–20.  And courts have put significant weight on the lack of

10   evidence of actual confusion in the marketplace where the products have been

11   simultaneously on the market for a substantial period of time.  See, e.g., Brookfield, 174

12   F.3d at 1050 ("We cannot think of more persuasive evidence that there is no likelihood of

13   confusion between these two marks than the fact that they have been simultaneously used

14   for five years without causing any consumers to be confused as to who makes what.")[8];

15   Hard Candy, LLC v. Anastasia Beverly Hills, Inc., 921 F.3d 1343, 1363 (11th Cir. 2019)

16   ("A reasonable person could conclude that the lack of evidence is at least probative of the

17   conclusion that there was no likelihood of confusion—hundreds of thousands of cosmetics

18   consumers purchased the allegedly infringing kit, several times more likely saw it on store

19   shelves or online, and still there is no evidence that anyone, anywhere, was ever

20   confused."); CareFirst of Maryland, Inc. v. First Care, P.C., 434 F.3d 263, 269 (4th Cir.

21   2006) (nine years of coexistence with no evidence of actual confusion "creates a strong

22   inference that there is no likelihood of confusion"); see also 3 J. Thomas McCarthy,

23   McCarthy on Trademarks and Unfair Competition § 23:18 (5th ed. 2024) ("[W]hen the

24   parties have made significant use of their respective designations in the same geographic

25   market for a substantial period of time, the absence of any evidence of actual confusion

26

27   [8] The court in Brookfield focused not just on the lack of actual evidence of confusion, but
     on the party's concession that the marks were not "confusingly similar." 174 F.3d at 1050.
28   That applies equally to this case given the admission by Plaintiff that the packaging
     between the two products is not similar.  See Harmon Decl., Ex. 27 at 166:3–15.

may in some cases justify an inference that the actor's use does not create a likelihood of confusion.").

In the light most favorable to Plaintiff, the survey evidence demonstrates some evidence of actual confusion, but not enough to ignore the lack of any evidence of actual confusion when the two products were simultaneously sold.  Accordingly, this factor is neutral and does not favor either party.[9]

### v.    Similarity in the Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion."  <u>Sleekcraft</u>, 599 F.2d at 353.  These products were not sold in the same channels.  Defendant Kendo exclusively sold MJB EYE-CONIC eye shadow through luxury retailer partners, including Sephora, Neiman Marcus, Marc Jacobs' boutiques, and through the Marc Jacobs Beauty website.  <u>See</u> Loftis Decl. ¶ 43.  None of those retailers have sold Plaintiff's EYECONIC eye cream; rather, Plaintiff sells its EYECONIC eye cream out of its principal's dermatology practice, various independent salons and spas, specialist online dermatologists' marketplaces, and on Amazon.  <u>See</u> Harmon Decl., Ex. 27 at 79:8–80:16.[10]

Plaintiff argues that both products are sold to "high-end customers, so the consumer bases are identical, and this alone establishes that the relevant marketing channels are identical."  <u>Id.</u>  But the only authority Plaintiff cites for that proposition actually <u>supports</u> a finding of nonconvergent marketing channels here.  In <u>Moroccanoil</u>, the court noted that the products were sold in <u>different</u> marketing channels—where, like here, one party sold its product in high-end retail stores and the other sold its product through non-luxury stores.  <u>Moroccanoil, Inc. v. Zotos International, Inc.</u>, 230 F. Supp. 3d 1161, 1775–76 (9th Cir. 2017).  The court then explained that the "similarities between the products

---

[9] At most, this factor slightly favors Plaintiff but that still would not change the Court's overall finding as to likelihood of confusion.

[10] Plaintiff initially argued that Defendants also sold MJB EYE-CONIC on Amazon by referencing an unknown third-party's advertisement on the site.  <u>See</u> Pl. MSJ at 12. However, Plaintiff dropped this argument in later briefs, <u>see</u> Pl. Reply at 12, after failing to cite authority that unauthorized resales support similarity of trade channels.

suggest[ed] an overlapping general class of consumers"—a fact that does not affect the marketing channels inquiry here, given that these products are not related.  Id. (emphasis added).

Because the products are sold through nonoverlapping marketing channels, this factor favors Defendants.

### vi.     The Degree of Care Likely to be Exercised by Purchasers

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution."  Sleekcraft, 599 F.2d at 353. "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely."  Id.  "Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely."  Id.

Defendants argue that Plaintiff admitted that "few purchasing decisions are so carefully made" as are purchases of its products and that its products are "very expensive." Def. MSJ at 28 (citing Harmon Decl., Ex. 27 at 50:11–13, 67:17–68:1).  Plaintiff seemingly concedes that this factor favors Defendants by arguing that even if their customers exercise a "high level of care," this factor is not "sufficient to tip the scales in the other direction, when the other factors strongly show likelihood of confusion."  Pl. MSJ at 13.

Accordingly, this factor favors Defendants given Plaintiff's repeated assertions that its clientele is high-end, and its product is "very expensive."

### vii.     Defendants' Intent in Selecting its Mark

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived."  Sleekcraft, 599 F.2d at 354.  Plaintiff points to several reasons why the Court should presume Defendants' wrongful intent in using its mark.  See Pl. MSJ at 8.  First, Plaintiff sent Defendant Sephora USA a single sample of its EYECONIC eye

1    cream on January 31, 2013 and six more samples on June 9, 2014.  <u>See</u> Kraffert Decl. ¶ 9;

2    Ex. 45.  Defendants argue that there is no evidence that it even received the samples, let

3    alone that it made its way out of the mailroom into the hands of any decisionmaker.  <u>See</u>

4    Def. Opp'n at 22.  The Court agrees with Defendants that Plaintiff failed to provide

5    sufficient evidence to impute bad faith based on these samples.

6            Second, Plaintiff argues that Defendants had constructive notice of Plaintiff's April

7    30, 2013 EYECONIC registration.  <u>See</u> Pl. MSJ at 8.  This is Plaintiff's most persuasive

8    evidence of bad faith.  Defendants contend that Kendo's copy team and its outside counsel

9    conducted searches that revealed no registrations for EYECONIC or EYE-CONIC.  <u>See</u>

10   White Decl. ¶ 21.  However, the Court finds it dubious that Kendo would be unable to find

11   the only Class 3 registration for EYECONIC in the United States.

12           Third, Plaintiff claims that the meeting it had with Sephora Canada in Sephora's

13   San Francisco headquarters was sufficient to provide Defendants with constructive

14   knowledge.  <u>See</u> Pl. MSJ at 8–9.  However, there is a clear dispute regarding whether a

15   Sephora USA buyer was even present.  <u>See</u> Second Harmon Decl., Ex. 112 (dkt. 102-3) at

16   68:4–19 (deposition of Ms. Bridges claiming that she has no memory of a Sephora USA

17   buyer being present despite writing an email that states a Sephora USA buyer was present).

18   This evidence is too speculative to impute constructive knowledge on Defendants.

19           Fourth, Plaintiff points to Kendo's failure to disclose that Sephora USA continued

20   to sell MJB EYECONIC after Plaintiff's cease and desist letter was sent on October 12,

21   2021.  <u>See</u> White Decl. ¶ 3; Loftis Decl. ¶ 64.  However, Kendo informed Plaintiff on

22   November 21, 2021 that it would sell its inventory "within the next sixty (60) days."

23   Loftis Decl. ¶ 66; Ex. 5.  Given that Kendo sold its last MJB EYE-CONIC eye shadow on

24   December 31, 2021, Kendo fulfilled its promise.  <u>See</u> Loftis Decl. ¶ 58.[11]

25           The most compelling evidence for Defendants' wrongful intent is their failure to

26

27   ───────────────

28   [11] Although Sephora's last sale was on February 5, 2022, Kendo did not attest to Sephora's
     sales in its response, and regardless, February 5 was just barely beyond the 60 days.  <u>See</u>
     Abrams Decl. ¶ 14.

United States District Court
Northern District of California

1    locate Plaintiff's registered mark, but Defendants cite binding authority wherein the court

2    found no bad faith, despite the plaintiff's mark being registered.  See, e.g., M2 Software,

3    421 F.3d at 1085 (affirming grant of summary judgment in favor of defendant despite

4    evidence that defendant knew of plaintiff's registered trademark prior to alleged

5    infringement).

6         In sum, Plaintiff alleges several instances of bad faith by Defendants, but none that

7    would justify a trier of fact in concluding that Defendants had any intention of capitalizing

8    on Plaintiff's trademark.  Therefore, this factor is neutral.

9                     **viii.    Likelihood of Expansion into Other Markets**

10        "Inasmuch as a trademark owner is afforded greater protection against competing

11   goods, a 'strong possibility' that either party may expand his business to compete with the

12   other will weigh in favor of finding that the present use is infringing."  Sleekcraft, 599

13   F.2d at 354.  "When goods are closely related, any expansion is likely to result in direct

14   competition."  Id.  Plaintiff argues that there is evidence that Marc Jacobs Beauty is being

15   relaunched in partnership with Coty, a beauty product company.  See Pl. MSJ at 13.

16   Because Coty already co-brands Marc Jacobs' perfume products and sells them on

17   Amazon, Plaintiff argues that it is likely that Coty will sell Marc Jacobs Beauty line

18   products on Amazon in the future.  See id.  Defendants respond that they have no intention

19   to use the name EYE-CONIC on any future product and that Plaintiff's arguments are

20   speculative.  See Def. Opp'n at 26.  The Court agrees.  Even in the light most favorable to

21   Plaintiff, this evidence, by itself, is not enough to establish a "strong possibility" that

22   Defendants plan to expand their business.  See Sleekcraft, 599 F.2d at 354.  Accordingly,

23   this factor favors Defendants.

24                     **ix.    Overall Showing on Likelihood of Confusion**

25        All of the Sleekcraft factors either favor Defendants or are neutral.  The Court

26   concludes that, when viewing the evidence in the light most favorable to Plaintiff, no

27   reasonable juror could find a likelihood of confusion between Defendants' use of its MJB

28   EYE-CONIC mark and Plaintiff's EYECONIC mark.

21

United States District Court
Northern District of California

Because no reasonable juror could find a likelihood of confusion, Defendants are entitled to summary judgment on Plaintiff's claim for federal trademark infringement.

### 2. Plaintiff's Other Claims

The tests for infringement of a federally registered mark under § 32(1), 15 U.S.C. § 1114(1), infringement of a common law trademark, unfair competition under § 43(a), 15 U.S.C. § 1125(a), and common law unfair competition involving trademarks are the same: whether confusion is likely.  See Silberstein v. Fox Entm't Grp., Inc.,732 F. App'x 517, 519 (9th Cir. 2018) (citation omitted).  Balancing the Sleekcraft factors, as previously described, Defendants have demonstrated that no reasonable juror could find that they used a confusingly similar mark to Plaintiff's EYECONIC mark.

Accordingly, the Court also grants summary judgment for Defendants on Plaintiff's common law trademark infringement claim, federal unfair competition claim, common law passing off and unfair competition claim.

### 3. California Unfair Competition

Under the California Business and Professions Code § 17200, unfair competition is "any unlawful, unfair, or fraudulent business act or practice."  Cal. Bus. & Profs. Code § 17200.  To be considered unlawful, a business practice must be "forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." Shroyer v. New Cingular Wireless Servs., 606 F.3d 658, 666 (9th Cir. 2010) (internal quotation marks omitted).  Because Defendants have established that no reasonable juror could find that their conduct violates federal trademark infringement law, federal unfair competition law, common law trademark infringement law, or common law unfair competition law, Defendants' conduct is also not unfair competition under the California statute.[12]

---

[12] Additionally, because Defendants are entitled to summary judgment on all of Plaintiff's claims on the merits, the Court need not determine whether Defendants are also entitled to summary judgment on their affirmative defenses of laches and statute of limitations.

22

1

**B.      Remaining Motions**

2          There are three other motions pending:  Plaintiff's motion to exclude Defendants'

3   expert Brian M. Daniel (dkt. 134), Plaintiff's motion to exclude Defendants' expert John

4   R. Hauser (dkt. 135), and Defendants' motion to strike Plaintiff's and Defendants' jury

5   demands (dkt. 113).  For the reasons below, the Court denies Plaintiff's motions as moot,

6   denies Defendants' motion to strike Plaintiff's jury demand as moot, and grants

7   Defendants' motion to strike its own jury demand.

8          Because the Court grants summary judgment for Defendants, both of Plaintiff's

9   motions are moot.  In one motion, Plaintiff moves to exclude Defendants' rebuttal expert

10  who calculates Defendants' profits derived from the allegedly infringing sales.  See Mot.

11  to Exclude Daniel (arguing that expert who calculated Defendants' profits derived from

12  trademark infringement should be excluded).  There is no need to determine whether

13  Defendants' expert on remedies should be excluded given that the Court determined there

14  was no trademark infringement in the first place.  Plaintiff also moves to exclude

15  Defendants' rebuttal expert who critiques Plaintiff's expert, Dr. Jerry Wind, who

16  conducted a likelihood of confusion survey.  See Mot. to Exclude Hauser.  However, the

17  Court did not rely on the Hauser report in ruling on the parties' summary judgment

18  motions, and even if it had, Plaintiff waived any objection to it being considered as part of

19  that record.  See N.D. Cal. L.R. 7-3(a), 7-3(c), 7-3(d)(1).  And now that the Court has

20  granted summary judgment for Defendants on all of Plaintiff's trademark infringement

21  claims, the motion is moot.

22         Finally, Defendant's motion to strike Plaintiff's jury demand is similarly moot,

23  given that Plaintiff's claims will not proceed to trial.  See Mot. to Strike at 1–12.

24  However, Defendants also move to strike Kendo's own jury demand for its cancellation

25  counterclaim, arguing that the claim is equitable.  See Mot. at 12–13; see also Am. Answer

26  at 14–16 (bringing cancellation counterclaim pursuant to 15 U.S.C. §§ 1064, 1119).

27  Plaintiff does not oppose Defendants' motion to strike Kendo's jury demand.  See Mot. to

28  Strike Opp'n (dkt. 121) (opposing only motion to strike Plaintiff's jury demand).

United States District Court
Northern District of California

The Court agrees that Kendo's trademark cancellation claim is equitable in nature. See Empresa Cubano Del Tabaco v. Culbro Corp., 123 F. Supp. 2d 203, 209 (S.D.N.Y. 2000) ("A claim for cancellation of a trademark registration pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119, is equitable in nature and does not give rise to a jury trial right."); Arctic Cat, Inc. v. Sabertooth Motor Grp., LLC, No. CV 13-146 (JRT/JSM), 2016 WL 4212253, at *6 (D. Minn. Aug. 9, 2016) (striking jury demand because "the bulk of district courts to consider the argument have found a cancellation claim to be equitable"). Kendo is therefore not entitled to a jury trial, and the Court GRANTS the motion to strike its jury demand.  See Fed. R. Civ. Proc. 39(a)(2); Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc., 778 F.3d 1059, 1074–75 (9th Cir. 2015).

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment and DENIES Plaintiff's motion for summary judgment.  The Court also DENIES Defendants' motion to strike Plaintiff's jury demand and Plaintiffs' motions to exclude Defendants' experts as MOOT.  Finally, the Court GRANTS Defendants' motion to strike Kendo's jury demand on its cancellation counterclaim.

**IT IS SO ORDERED.**

Dated:  September 4, 2024

_____
CHARLES R. BREYER
United States District Judge